

*Accident Reconstruction Services*

# National Collision Technologies, Inc.

### ACCIDENT RECONSTRUCTION REPORT

Gregory L. Jones, Jr.

v.

Darrell Simmons, et al.

NCTI File Number: NC011420

#### PREPARED FOR:

Louis Bonnaffons
Attorney at Law
1100 Poydras St., Suite 1700
New Orleans, LA  70163

EXHIBIT
3



*Accident Reconstruction Services*

National Collision Technologies, Inc.
PO Box 14953
Baton Rouge, Louisiana 70898-4953

Phone:   (225) 924-7756
Fax:       (225) 924-7762
Web:      www.nctigroup.com

March 17, 2022

Louis Bonnaffons
Attorney at Law
1100 Poydras St., Suite 1700
New Orleans, LA 70163

Case Re:      Gregory L. Jones, Jr. v. Darrell Simmons, et al.
United States District Court – Eastern District of Louisiana
No. 2:21-CV-00139
Date of Accident: January 14, 2020
NCTI File: NC011420

Dear Mr. Bonnaffons:

Thank you for your assignment to our firm on February 12, 2020.  NCTI has conducted an analysis of the traffic collision in the above referenced matter.   The information reviewed to form the basis of our conclusions includes:

- LA State Police Accident Report #20200004263
- Provided Photographs
- Deposition of Trooper Ronald J. Methvin, January 18, 2022
- Deposition of Gregory L. Jones, Jr., January 27, 2022
- Deposition of Darrell Simmons, January 27, 2022
- Report of Nicholas Schlechte, February 18, 2022
- NCTI Site Exam, February 19, 2020
- NCTI Vehicle Exam – 2020 International Tractor, February 14, 2020
- Louisiana Revised Statutes
- **Louisiana Commercial Driver's License Manual**
- Commercial Vehicle Preventable Accident Manual
- Delmar Tractor-Trailer Truck Driver Training
- The Anatomy of a Tractor Trailer Jackknife, NHTSA
- Northwestern University Traffic Crash Reconstruction
- Federal Motor Carrier Safety Regulations
- Site Research, Google Aerial, and Street Views
- Vehicle Research
- NHTSA Vehicle Database
- NCTI Calculations

The subject collision occurred on January 14, 2020, at approximately 5:30am on LA Hwy 308, approximately 5.7miles south of LA Hwy 655 in Lafourche Parish, LA.  The collision was investigated by Tpr. Ronald Methvin of the Louisiana State Police who reported that the weather conditions were cloudy, dry, and dark with no streetlight.

LA Hwy 308 is a curved, level, two-lane (one lane in each direction) roadway providing for generally north-south travel (oriented east-west near accident location).  The 11ft wide N/B and S/B travel lanes are separated by a double yellow solid center line near the point of impact (POI).  North of the POI there is a solid no passing line for S/B motorists while N/B motorists have a dashed centerline.  The POI is near the center of an "S" curve where motorists in each direction would experience a gradual curve to the right prior to the POI and then a gradual curve back to the left past the POI.  Solid white fog lines separate the outer edges of each travel lanes from the 2ft wide paved shoulders which lead to open ditches on each side of the roadway.  The speed limit for LA Hwy 308 is 55mph.  See Figures 1-6.



Figure 1: Aerial photograph from Google Earth

2



**Figure 2: Aerial photograph from Google Earth**



**Figure 3: Google Street View, facing N/B on LA Hwy LA 308**



**Figure 4: Google Street View, facing N/B on LA Hwy LA 308 Near POI**



**Figure 5: Google Street View, facing S/B on LA Hwy LA 308**



Figure 6: Google Street View, facing S/B on LA Hwy LA 308 Near POI

## POLICE REPORT

Two vehicles were involved:

1. An 18-wheeler, specifically a 2016 Kenworth Construct T800 towing a Mate dump trailer and driven by Gregory Jones Jr. (LA Class "A" License), age 41 and owned by CJD Trucking.

2. An 18-wheeler, specifically, a 2020 International LT 625 towing a Utility box trailer and driven by Darrell Simmons (MS Class "A" License), age 47 and owned by Ryder Truck Rental (McLane Company was the carrier). Demetrius Dennis, age 24, was a passenger in the International.

Tpr. Methvin reported that Mr. Jones' Kenworth was N/B on LA 308 while Mr. Simmons' International was S/B on LA 308. Mr. Jones' Kenworth entered a right curve, applied brakes leaving skid marks and crossed the centerline. Mr. Jones veered back into the N/B lane, but his trailer did not leave the S/B lane.

Mr. Simmons' International had just cleared a right curve, began braking, and left skid marks on the roadway, before striking Mr. Jones' trailer. Mr. Simmons' 18-wheeler was forced off the roadway to the right where it struck multiple trees before coming to rest off of the roadway, facing south. Impact caused Mr. Jones' trailer to rotate counterclockwise and swing off of the roadway to its right. Mr. Jones' 18-wheeler came to rest across both lanes of the roadway facing west.

Tpr. Methvin located several gouges in the S/B lane near the area of impact south of Mr. Simmons' skid marks and north of Mr. Jones' skid marks. Mr. Jones' skid marks begin in the N/B lane but crossed the centerline into the S/B lane just before impact.

Mr. Jones stated to Tpr. Methvin that as he was N/B on LA 308 and observed Mr. Simmons approaching S/B with his bright lights activated. Mr. Jones flashed his bright lights several times to get Mr. Simmons to dim his headlights and believed that Mr. Simmons' 18-wheeler crossed into his lane and struck his trailer.

Mr. Simmons stated to Tpr. Methvin that he was S/B on LA 308 and after completing the slight right curve observed Mr. Jones' 18-wheeler in his lane. Mr. Simmons advised that he applied his brakes and attempted to steer away from Mr. Jones' 18-wheeler. He advised he was not able to avoid striking Mr. Jones' trailer which was in his lane.

Tpr. Methvin reported that Mr. Jones' Mate trailer sustained "Very Severe" damage and Mr. Jones' 18-wheeler was towed from the scene. Mr. Jones was listed as having "possible/complaint" of injury and was transported to a medical facility. Tpr. Methvin reported that Mr. Jones' 18-wheeler traveled 133ft after impact and he listed 112ft of right rear skid and 75ft of left rear skid mark data. Mr. Jones' estimated speed was 55mph, his condition was listed as "Inattentive", his violation was "Driving Left of Center", and he was issued a citation (LA RS 32:71 – Driving on the Right Side).

Tpr. Methvin reported that Mr. Simmons' International sustained "Very Severe" damage and was towed from the scene. Mr. Simmons was listed as having "possible/complaint" of injury and was transported to a medical facility. Tpr. Methvin reported that Mr. Simmons' 18-wheeler traveled 134ft after impact and he listed 35ft of skid for Mr. Simmons' 18-wheeler. Mr. Simmons' estimated speed was 55mph, his condition was listed as "Normal", he was listed as having "no violations" and was not issued a citation

Tpr. Methvin's report included a sequence of Not-To-Scale diagrams. See Figures 7-9.




**Figure 7: Tpr. Methvin Report Diagram 1**          **Figure 8: Tpr. Methvin Report Diagram 2**



**Figure 9: Tpr. Methvin Report Diagram 3**

**DEPOSITIONS**

Tpr. Methvin testified in a deposition on January 18, 2022 that:
- The accident occurred on LA 308; blacktop road, dry, no abnormalities, dark, no streetlights.
- He would disagree that the vehicles could not have left skid marks because it was wet.
- Mr. Jones was inattentive, and his violation was crossing the centerline, RS 32:71.
- Mr. Jones speed estimate was from Mr. Jones. He has no other indication of the speed.
- There may be a recommended lower speed but the speed limit for that highway is 55mph.
- He could not confirm or deny that Mr. Simmons had his bright lights on prior to impact.
- Physical evidence revealed that Mr. Jones crossed the centerline of LA 308 prior to impact.
- Impact occurred in the southbound lane - **Darrell Simmons' lane.**
- Gouge marks typically show the area of impact.
- The gouges caused by this crash were in Mr. Simmons' lane of travel.
- He observed skid marks beginning in the NB lane and leading straight into the southbound lane to the area of impact.
- He measured the skid marks with a roller wheel.
- It would have been tough for Jones to see Simmons approaching with sufficient time to flash his brights multiple times.
- Based on the physical evidence, Mr. Simmons did not cross into Mr. Jones' lane.
- There were no violations by Darrell Simmons in regard to this accident.
- All of the measurements were obtained and/or verified by him as the investigating officer.
- His conclusions and findings were based entirely on the physical evidence at the scene.

Gregory Jones Jr. testified in a deposition on January 27, 2022, that:
- He has been a truck driver for 13 years and was working for CJD Trucking at the time of the accident.
- He was coming from Fourchon; had dumped a load of concrete gravel and was empty.
- He had driven this route before and was familiar with the roadway.
- He was intending to go to Byron Talbot sand pit in Hahnville to get a load of river sand.
- He was northbound on LA 308.
- Before getting to Valentine, LA, the speed limit is 45mph.
- He dropped his speed to 40, 42mph when he got to the curve.
- It was foggy that night and an oncoming vehicle seemed to have their high beams on.
- He flashed his lights to alert them to take their high beams off.
- He would say he saw the other vehicle's headlights for a minute before the accident.
- When he got into the curve, he noticed the oncoming vehicle coming toward his lane.
- He pulled slightly to the right and the accident occurred.
- The accident occurred in his lane, the northbound lane.
- The other tractor hit his trailer.
- The road was wet at the time of the accident and too wet for skid marks.
- He does not remember seeing any portion of Mr. Simmons' vehicle cross the center line.
- He is unsure if any portion of his vehicle crossed the center line into Mr. Simmons' lane.
- He did not apply his brakes before the impact, only afterward.

8

- His vehicle ended up jackknifed across both lanes of the highway.
- He was issued a citation 2-3 days after the accident.
- He did not undergo any post-accident drug and alcohol testing.

Darrell Simmons testified in a deposition on January 27, 2022, that:

- He had a CDL for around 20 years before the accident.
- He had been working for McLane since April 2019.
- He was driving a 2020 International and had a passenger in the sleeper compartment.
- They had less than a half load and were heading to Walmart in Houma, LA.
- There is a curve where this accident happened.
- The speed limit starts at 55mph, but it was in a curve, so the speed limit was 40mph.
- The bayou was on the right side of him in the direction he was traveling.
- When he got into the curve, he saw a truck coming pretty fast at him.
- The other driver did not flash his lights at him; his lights weren't on bright.
- He could tell the other driver was coming at him fast and was in his lane.
- When he came out of the curve heading to the second curve is when he noticed the other truck coming at him pretty fast.
- He slowed down and hit his brakes.
- About 2-3 sec later, the other 18-wheeler's trailer swung and knocked him off the road.
- When he was hitting his brakes, he looked up and saw the trailer swing around and hit him, knocking him off the road.
- Mr. Jones' tractor stayed in his lane, but his trailer fishtailed into him.
- He does not know what RPM he would be at if he were going 40mph and not accelerating.
- The photo of his dashboard does not reflect his speed at the time of the crash.

## AT-SCENE PHOTOGRAPHS

The at-scene photographs depict the final rest positions of Mr. Jones' Kenworth and Mr. Simmons' International.   The photographs also show tire marks, gouges, and debris associated with the accident.

Gouge marks in the southbound lane indicate the location of the Point of Impact (POI) and maximum engagement of the two vehicles.   Double tire marks from Mr. Jones' trailer lead from the northbound lane to POI.   There is another set of tire marks from Mr. Simmons' International in the southbound lane leading to POI.   See Figures 10 – 13.



**Figure 10: Gouge Marks in southbound lane**

10



**Figure 11: Mr. Jones' tire mark leading to POI**



**Figure 12: Mr. Jones' tire mark leading to POI**



**Figure 13: Mr. Simmons' tire mark leading to POI**

Mr. Jones' 18-wheeler came to rest north of the point of impact (POI), with its tractor spanning across the roadway and its trailer in the grass beyond the shoulder. It is near a utility pole which shows signs of damage from contact with the right side of the trailer during its post-impact travel. Tire marks both in the grass and on the pavement lead to the Kenworth's final rest. See Figures 14–18.



**Figure 14: Kenworth Final Rest**

13



**Figure 15: Tire mark on pavement**



**Figure 16: Tire marks on pavement, gravel, grass**



**Figure 17: Tire mark on grass**



**Figure 18: Utility Pole**

Mr. **Simmons'** 18-wheeler came to rest south of the POI in the grass and treeline beyond the roadway, with only the rear left corner still in the roadway. Gouges and tire ruts lead from POI to final rest. See Figures 19 – 22.



**Figure 19: International Final Rest**



**Figure 20: International Final Rest**



**Figure 21: International Post-Impact travel**



**Figure 22: International Post-Impact travel**

## SITE EXAM

NCTI's examination of the accident site on February 19, 2020 included photographs, drone aerial, surface friction testing, a total station survey and a drive-thru video. The surface friction measured 0.6g in the travel lanes and 0.5g in the gravel. NCTI located the gouge marks and ruts seen in the police photographs. The only remaining tire mark was a small portion of the mark left when Mr. Jones' trailer crossed the centerline. See Figures 23 – 29.



**Figure 23: Gouge Marks**



**Figure 24: Gouge Marks**



**Figure 25: Tire Rut**



Figure 26: Mr. Simmons' Final Rest



**Figure 27: Tire Ruts and Mr. Jones' Final Rest**



**Figure 28: Tire Ruts and Mr. Jones' Final Rest**



**Figure 29: Drone Aerial CAD**

NCTI photographed driver's vantage points from approximately 800ft from POI in both directions, showing that both vehicles had an open sightline to each other. At the speed limit of 55mph, they would travel 800ft in 9.9sec. See Figures 30 and 31.



**Figure 30: Southbound, 830ft from POI**



**Figure 31: Northbound, 770ft from POI**

23

As shown in Figure 30 above, LA Hwy 308 southbound has a curve advisory sign with an advisory speed of 40mph, following immediately by a 55mph speed limit sign. See Figure 32.



**Figure 32: Southbound, 830ft from POI, zoomed in**

Google Street Views show that there is a similar 40mph advisory speed sign for the northbound direction. This sign is approximately ½ mile south of the accident site at the start of a right hand curve. This curve ends approximately 800ft before the right hand curve at the accident site. See Figures 33 and 34.



Figure 33: Northbound speed advisory sign



Figure 34: Aerial photograph from Google Earth

25

The yellow sign displaying 40mph is designated by Manual of Uniform Traffic Control Devices, (MUTCD) as an "advisory" sign rather than a regulatory sign, meaning its provides only a suggested speed for motorists to negotiate the curve. The MUTCD differentiates advisory speed limit signs from regulatory speed signs. See Figures 35 and 36 below.



Figure 35: MUTCD Regulatory Signs



Figure 36: MUTCD Advisory Signs

According to the MUTCD[1]:

- *Warning signs call attention to unexpected conditions on or adjacent to a highway, street, or private roads open to public travel and to situations that might not be readily apparent to road users.*
- *The Advisory Speed (W13-1P) plaque may be used to supplement any warning sign to indicate the advisory speed for a condition.*
- *The Speed Limit (R2-1) sign shall display the limit established by law, ordinance, regulation, or as adopted by the authorized agency based on the engineering study.*

## VEHICLES

NCTI did not have an opportunity to inspect Mr. Jones' Kenworth tractor and Mate dump trailer. The only apparent damage to Mr. Jones' Kenworth tractor documented in the Police photographs was to the 5th wheel. No other damage was immediately apparent to Mr. Jones' Kenworth.

Mr. Jones' Mate trailer sustained contact damage to the left side beginning near the midpoint of the trailer with scrapes and gouges to the body of the trailer near the center side marker light. The scrapes continue rearward to the back corner of the trailer where there is red paint transfer from Mr. Simmons International. The heaviest damage to the trailer was to the left outboard tire/wheel assemblies of axles 4&5. Heavy contact was noted to the wheels and tires were dismounted. See Figures 37 - 41.



**Figure 37: Mr. Jones' Kenworth Tractor and Mate Trailer**

---

[1] Federal Highway Administration (FHWA). (2009). *Manual on Uniform Traffic Control Devices*. 1, 10, 56-58, 103, 109-112.



**Figure 38: Mr. Jones' Kenworth 5ᵗʰ Wheel**



**Figure 39: Mr. Jones' Kenworth 5ᵗʰ Wheel**



**Figure 40: Mr. Jones' Mate Trailer**



**Figure 41: Mr. Jones' Mate Trailer**

NCTI's inspection of Mr. Simmons International tractor on February 14, 2020, included photographs, measurements, brake examination, and removal of the engine electronic control module, (ECM). The front of the International sustained heavy contact damage. The front bumper, grill, radiator and engine components were shifted to the rear. Both front tires were unseated from the wheels and both wheels were damaged. The windshield was shattered and the contact damage on the left side of the tractor extends to the rear of the cab and included damage to the driver's door and the sleeper. The damage to the left side of the International is consistent with being struck by the left side of Mr. Jones' dump trailer.

The contact damage on the right side extends from the front to just past the passenger door. There is also damage to the wind deflector above the cab. The right-side damage is consistent with Mr. Jones' International striking the trees before coming to final rest. An examination of the braking system revealed no defects.

NCTI was unable to locate the headlights of Mr. Simmons' International. According to the 2020 International LT Series brochure, Mr. Simmons' tractor was installed with LED headlights which do not contain filaments. It would be impossible to determine if the high beams or low beams were activated by inspecting the bulbs.

During NCTI's inspection, the headlight switch was found detached from the dashboard and in the drivers' seat in the off position. NCTI is unable to determine the status of the headlights at the time of the collision. See Figures 42 - 48.



Figure 42: Mr. Simmons' International Tractor



Figure 43: Mr. Simmons' International Tractor



**Figure 44: Mr. Simmons' International Tractor**



**Figure 45: Mr. Simmons' International Tractor**



**Figure 46: Mr. Simmons' International Tractor**



**Figure 47: Mr. Simmons' International Tractor**



Figure 48: Mr. Simmons' International Tractor

## ECM ANALYSIS

Mr. Simmons' International was equipped with a Cummins Engine with an Electronic Control Module (ECM) which records accident data. The ECM was removed by NCTI during the inspection and was sent to a company that specializes in the bench-top extraction of collision-related data. The ECM data report from DELTA |v| contained three Sudden Vehicle Speed Deceleration Records. None of these records appear to be related to this accident for the following reasons:

1. Record #1:
   a. Time from Accident to Download = 18hrs
   b. Distance from Accident to Download = 308miles
   c. In the 15sec after the sudden deceleration event, the International slows and then increases its speed, never coming to a stop.

2. Record #2:
   a. Time from Accident to Download = 172hrs
   b. Distance from Accident to Download = 2836miles
   c. In the 15sec after the sudden deceleration event, the International slows and then increases its speed, never coming to a stop.

3. Record #3:
   a. Time from Accident to Download = 21hrs
   b. Distance from Accident to Download = 322miles
   c. In the 15sec after the sudden deceleration event, the International slows and then increases its speed, never coming to a stop.

Mr. Simmons' International became disabled at final rest, was towed from the scene, and was not in use during the 30 days between the accident and download.

## ANALYSIS

Mr. Jones traveled 133ft after the POI according to the police report and physical evidence. This included approximately 40ft with all wheels on the pavement, followed by 93ft with the tractor tires on the pavement and the trailer tires on the gravel and grass. NCTI measured a surface friction of 0.6g on the pavement and 0.5g on the gravel. NCTI assumed a standard value of 0.5g for the grass based on Northwestern[2]. Due to the construction of 18-wheeler tires, the actual drag factor is approximately 75% of the surface friction, meaning Mr. Jones decelerated at a rate of 0.45g on the pavement. During the 93ft when Mr. Jones was traveling partially on the pavement and partially on the gravel and grass, the effective drag factor was 0.42g. Based on this post-impact travel, Mr. Jones was traveling at least 41mph coming out of the impact. This calculation does not account for any speed lost from impact with Mr. Simmons. See Figure 49.



**Figure 49: Mr. Jones' Post-Impact CAD**

Police also reported and photographed pre-impact skid marks, two double tire marks leading from Mr. Jones' lane into Mr. Simmons' lane, the longest of which was 112ft. Taking into account these pre-impact tire marks and assuming full (0.45g) braking, Ms. Jones' speed prior to braking could have been at least 57mph. Again, this calculation does not account for any speed lost from impact with Mr. Simmons.

---

[2] Northwestern University Center for Public Safety. (2011). *How to Use the Traffic Template*. Evanston, Il. Page 20.

Mr. Jones was traveling in a right-hand curve with a radius of 1,000ft shortly before impact. Based on his calculated speed of 41–57mph, he experienced a lateral acceleration of 0.11g to 0.22g. Mr. Simmons' right hand curve was slightly wider at 1,200ft. At his speed of 55mph, he experienced a lateral acceleration of 0.17g. A value of 0.1g to 0.2g is considered a comfortable lateral acceleration, meaning that even at 55mph, Mr. Simmons would have experienced a comfortable lateral acceleration that would not cause him to leave his lane.

**Expert Report of Nicholas Schlechte**

NCTI reviewed the report of Nicholas E. Schlechte who opined the following regarding Mr. Simmons' International tractor:

1. The electrical system experienced a sudden power loss which resulted in the non-zero values of the instrument cluster.
2. Comparison of the speed computations using the speed from RPM and final drive ratio indicates the tachometer (RPM) and speedometer positions are within operational ranges of each other as comparable to the EDR data.
3. The speedometer and tachometer indicated values show that at the time of the power loss, Mr. Simmons' tractor-trailer was traveling approximately 56 mph, at about 1100 rpm, in top (12th) gear.

Based on the speedometer and tachometer readings, NCTI assumes that Mr. Simmons' was traveling at approximately 55mph. Simply stated, Mr. Simmons was not speeding but was adhering to the regulatory speed limit of 55mph. As previously outlined by the MUTCD, the 40mph advisory speed sign is merely a warning, not a regulatory sign.

Tire marks at the accident site show that Mr. Jones' trailer swung left into Mr. Simmons' lane. While Mr. Jones testified in deposition that he did not brake prior to the impact, it is more probable than not that he applied only his trailer brakes. By applying the independent brakes, (trailer brakes without the tractor brakes), the trailer tires lock and slide left, outboard of the right-hand curve that Mr. Jones is encountering. This is consistent with the dual skid marks originating within Mr. Jones' lane and crossing the centerline to the POI within Mr. Simmons' lane.

NCTI contacted Kenworth of Louisiana in Shreveport, LA and confirmed that Mr. Jones' tractor was equipped with a trailer brake lever allowing for the trailer brakes to be activated independently from the tractor brakes.

The National Highway Traffic Safety Administration (NHTSA) paper "The Anatomy of a Tractor Trailer Jackknife[3]" discusses how applying the trailer brakes without the tractor brakes can cause a jackknife, especially in a curve.

- Side force drops to essentially zero when the wheel locks up (100% slip).
- It is the loss of side force or lateral stability that occurs when the drive axles lock up that usually causes a jackknife.

---

[3] Radlinski, R.W. "The Anatomy of a Tractor Trailer Jackknife", Vehicle Research and Test Center, National Highway Traffic Safety Administration.

- Next consider the case of trailer wheels locking.  The trailer wants to spin-out since the locked wheels are at the rear of the trailer.
- If there is side force acting on the vehicle when wheel lock occurs the instability will occur faster.  If, for example, the vehicle is in a curve and the drive wheels lock, the centrifugal force, a side force acting at the rear of the tractor, has very little force at the rear tires to resist it and spin of the tractor leading to a jackknife will occur more rapidly.

The NHTSA paper includes a diagram showing how the locking of different wheels can cause different forms of jackknife.  When the trailer wheels are locked, this can cause trailer swing.  See Figure 50.



**Figure 50: NHTSA Paper Jackknife Diagram**

While Mr. Jones testified in his deposition that the road was wet and that it was impossible to leave skid marks on a wet road, police reported the road condition as dry and this can be seen clearly in the scene photographs.  Even if the road conditions were wet, this would not have prevented tire marks from being left on the pavement.  There were tire marks leading to POI in both directions, gouge marks and scrapes marking the POI, and tire marks, gouges, and ruts leading away from POI in both directions towards the vehicles' final rest.  There is no reason to suspect that any of the physical evidence found at the site is unrelated to the accident.

36

NCTI researched the Louisiana Revised Statues, Commercial Preventable Accident Manual, Delmar's Tractor-Trailer Truck Driver Training, Louisiana Commercial Driver's License Manual, and the Federal Motor Carrier Safety Regulations (FMCSR) and found the following excerpts applicable to the accident:

According to LA RS 32:71[4], "Driving on the right side, overtaking and passing, etc:"

- *Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway.*

According to LA RS 32:79[5], "Driving on roadway laned for traffic:"

- *A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.*

The Commercial Vehicle Preventable Accident Manual[6] provides the following "Driving Tips":

- The defensive driver tries to recognize potentially hazardous situations sufficiently in advance to allow time to safely maneuver past them. The defensive driver searches ahead of what is immediately in front, to have advance warning of approaching hazards.
- Learn to recognize driving situations that can be hazardous.
- Adjust speed, position, direction and attention to be able to maneuver safely if a hazard develops.
- Scan far enough ahead to be able to react safely to approaching situations.
- Scan thoroughly before changing speed or direction.
- Lane use and lane changing accidents primarily result from following too closely or being inattentive to traffic conditions ahead.
- Try to scan ahead of what is immediately in front of you.

According to the Louisiana Commercial Driver's License Manual[7]:

- Most good drivers look at least 12 to 15 seconds ahead. That means looking ahead the distance you will travel in 12 to 15 seconds.
- A hazard is any road condition or other road user (driver, bicyclist, pedestrian) that is a possible danger.
- Seeing hazards lets you be prepared. You will have more time to act if you see hazards before they become emergencies.
- Avoid Glare from Oncoming Vehicles. Do not look directly at lights of oncoming vehicles. Look slightly to the right at a right lane or edge marking, if available.
- If other drivers don't put their low beams on, don't try to "get back at them" by putting your own high beams on. This increases glare for oncoming drivers and increases the chance of a crash.

---

[4] Driving on the right side, overtaking and passing, etc., LA RS § 32:71 (2009)
[5] Driving on roadway laned for traffic, LA RS § 32:79 (1962)
[6] Uzgiris, S., Hales, C., Dilich, M. (1997). *Commercial Vehicle Preventable Accident Manual: A Guide to Countermeasures.* JJ Keller & Associates. Neenah, Wi. Pages 3, 22, and 29.
[7] American Association of Motor Vehicle Administrators. (2005). **"Chapter 2: Driving Safely," "Chapter 6: Combination Vehicles,"** *Louisiana Commercial Driver's License Manual.* Arlington, Va. Pages 2-10, 2-18, 2-27, 6-2 through 6-4.

- Control your speed whether fully loaded or empty. Large combination vehicles take longer to stop when they are empty than when they are fully loaded.
- When lightly loaded, the very stiff suspension springs and strong brakes give poor traction and make it very easy to lock up the wheels.
- Your trailer can swing out and strike other vehicles. Your tractor can jackknife very quickly.
- In any combination rig, allow lots of following distance and look far ahead, so you can brake early. **Don't be caught by surprise and have to make a "panic" stop.**
- When the wheels of a trailer lock up, the trailer will tend to swing around. This is more likely to happen when the trailer is empty or lightly loaded. This type of jackknife is often called a "**trailer jackknife.**"
- The trailer hand valve (also called the trolley valve or Johnson bar) works the trailer brakes.
- The trailer hand valve should be used only to test the trailer brakes. Do not use it in driving because of the danger of making the trailer skid.
- The foot brake sends air to all of the brakes on the vehicle (including the trailer(s)).
- There is much less danger of causing a skid or jackknife when using just the foot brake.

**The Louisiana Commercial Driver's License Manual** includes a diagram showing how locked-up trailer wheels can slide and cause a trailer jackknife. See Figure 51.

38



**Figure 51: CDL Manual Trailer Jackknife Diagram**

According to Delmar's Tractor-Trailer Truck Driver Training[8]:
- The trailer brake control valve, also called the hand valve, trolley valve, or independent trailer brake – operates the service brakes on the trailer only and should only be used in special situations.
- In any situation, it is always better to prevent a skid than to try to recover once a skid occurs.  Safe driving practices can help prevent skids.
- Adjust your speed before entering curves to reduce your chances of a cornering skid.
- Adjust your speed to the surface and weather conditions and to the curvature of the road.
- Do not overbrake.
- All wheels should start stopping at the same time.  If they do not, a skid can result when you brake your vehicle.
- A trailer jackknife is caused by too much braking or cornering.  In either case, the trailer tires skid because they become locked.  The force that locks them overcomes the traction with the surface of the road.  It is much more common to have a trailer jackknife than a tractor jackknife.
- Overbraking – caused by putting on the footbrake too hard or not using the trailer brake correctly.  The trailer brake should not be used for stopping the entire rig.

Mr. Jones testified that he did not undergo any post-accident drug and alcohol testing.  He also testified that he was issued a citation as a result of this accident.  Tpr. **Methven's** testimony is not clear on when the citation was issued; however, it appears to have been 2 days after the accident.

The Federal Motor Carrier Safety Regulations[9] states:

**§ 382.303 Post-accident testing.**

> (a) As soon as practicable following an occurrence involving a commercial motor vehicle operating on a public road in commerce, each employer shall test for alcohol for each of its surviving drivers:

>> (2) Who receives a citation within 8 hours of the occurrence under State or local law for a moving traffic violation arising from the accident, if the accident involved:

>>> (i) Bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or

>>> (ii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle.

> (b) As soon as practicable following an occurrence involving a commercial motor vehicle operating on a public road in commerce, each employer shall test for controlled substances for each of its surviving drivers:

---

[8] Alice Adams (2013).  "Chapter 3: Control Systems," "Chapter 20: Skid Control" *Delmar's Tractor-Trailer Truck Driver Training, 4th Edition*.  Clifton Park, NY.  Page 65-67, 431-432.
[9] Part 382 section 303; Post-accident testing.  CFR Title 49 §382.303.  2022.

(2) Who receives a citation within thirty-two hours of the occurrence under State or local law for a moving traffic violation arising from the accident, if the accident involved:

(i) Bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or

(ii) One or more motor vehicles incurring disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle.

(d)

(1) *Alcohol tests.* If a test required by this section is not administered within two hours following the accident, the employer shall prepare and maintain on file a record stating the reasons the test was not promptly administered. If a test required by this section is not administered within eight hours following the accident, the employer shall cease attempts to administer an alcohol test and shall prepare and maintain the same record. Records shall be submitted to the FMCSA upon request.

(2) *Controlled substance tests.* If a test required by this section is not administered within 32 hours following the accident, the employer shall cease attempts to administer a controlled substances test, and prepare and maintain on file a record stating the reasons the test was not promptly administered. Records shall be submitted to the FMCSA upon request.

Mr. Jones, as a professionally licensed driver familiar with the handling characteristics of his vehicle, should have been able to maintain control of his vehicle within its lane and avoid entering **Mr. Simmons' travel path.** Mr. Jones testified that he does not recall if he saw **Mr. Simmons'** vehicle cross the center line. Mr. Jones also testified that he does not know for sure whether any portion of his vehicle crossed into Mr. Simmons' travel lane. The physical evidence is clear that **Mr. Jones' trailer entered Mr. Simmons'** travel lane. It is more probable than not that this was caused by **Mr. Jones applying his trailer brakes. This caused Mr. Jones' trailer tires to lock up and** lose lateral stability. The centrifugal force from the curve then caused the trailer to swing into Mr. Simmons' lane resulting in the collision.

## CONCLUSIONS

In summary, NCTI has formulated the following conclusions:
- The subject collision occurred on January 14, 2020, at approximately 5:30am on LA Hwy 308 in Lafourche Parish, LA.
- The speed limit for LA Hwy 308 was 55mph.
- There was a 40mph advisory speed in both directions in this segment of LA Hwy 308.
- The weather was dry, cloudy, and dark with no streetlights.
- Mr. Jones was driving a Kenworth tractor with a dump trailer northbound on LA Hwy 308 between 41 and 57mph.

41

- Mr. Simmons was driving a 2020 International tractor with a box trailer southbound on LA Hwy 308 at approximately 55mph with passenger Demetrius Dennis.
- Mr. Simmons was not speeding; his 55mph speed complied with the regulatory posted limit.
- Mr. Jones' trailer entered Mr. Simmons' lane, causing contact between Mr. Simmons' tractor and Mr. Jones' trailer.
- All physical evidence of impact was in Mr. Simmons' lane.
- There is no physical evidence that impact occurred in Mr. Jones' lane.
- There were double tire marks leading from Mr. Jones' lane into Mr. Simmons' lane.
- It is more probable than not that these tire marks were left by Mr. Jones' trailer.
- It is more probable than not that Mr. Jones applied his trailer brakes in the right hand curve of LA Hwy 308, causing his trailer tires to skid left into Mr. Simmons' lane.
- Mr. Jones employed an unsafe and ineffective driving strategy by applying the independent trailer brake.
- There is no evidence that Mr. Simmons' high beam headlights were on.
- LA RS 32:71, "Driving on the right side, overtaking and passing, etc" states *Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway.*
- LA RS 32:79, "Driving on roadway laned for traffic" states *A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.*
- Mr. Jones failed to keep his trailer in the right lane, causing it to enter Mr. Simmons' travel path.
- Mr. Jones failed to follow the guidelines of the Louisiana Commercial Drivers License Manual and the CVPAM by failing to scan ahead, appropriately respond to hazards ahead of him, and failing to keep his vehicle in his lane.

These findings are based on currently available information. The methodology and scientific principles employed in the reconstruction of the subject collision are based on my formal training and are accepted in the field of accident reconstruction. In the event of trial, NCTI intends to present charts, tables, and/or graphs in addition to photographs and diagrams as exhibits and/or demonstrative aids. A copy of my CV and testimony log is attached along with a summary of calculations expressed within this report. NCTI reserves the right to conduct further studies should additional information become available at a later date.

I am the President and owner of National Collision Technologies, Inc., a Louisiana-based corporation, founded in 1993 and dba NCTI. NCTI conducts technical investigations and reconstructs traffic collisions on a full-time basis. I have been investigating traffic collisions since 1977 and performing formal accident reconstructions since 1991. My training in the discipline of traffic accident reconstruction consists of over one thousand hours of formal tested courses. As the founder and Supervisor of the Baton Rouge City Police Traffic Homicide Unit, I was responsible for the on-scene investigation and reconstruction of all critical injury and fatal collisions for the purpose of determining criminal negligence and providing expert testimony. In addition, my responsibilities included: technical traffic investigations as requested by the Chief of Police, Internal Affairs, Parish and District Attorney, technical assistance to neighboring agencies and development of formal training for law enforcement.

To date, I have investigated over two thousand traffic collisions and have conducted formal reconstructions of over two thousand additional collisions.   I have provided expert testimony in over four hundred cases and qualified as an expert in accident reconstruction and/or rules of the road in Local, District, Military and Federal courts in Louisiana and Mississippi as well as by the LA State Supreme Court.

Sincerely,

Michael S. Gillen
President & Testifying Expert